FILED

2014 Mar-25  PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| NORMAN ODOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:11-CV-3086-SLB |
| | ) | |
| ERIC H HOLDER, JR., in his official capacity as Attorney General of the United States Department of Justice, | ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 31.)[1]  Plaintiff Norman "Pete" Odom has sued his employer, the Federal Bureau of Investigation [FBI], through Eric Holder, the United States Attorney General, alleging retaliation in violation of Title VII.  Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 31), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once

the moving party has met its burden, the non-moving party must go beyond the pleadings and

show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S.

317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
>
> > (A) citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information, affidavits or
> > declarations, stipulations (including those made for purposes of the
> > motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot produce
> > admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state

that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v.

Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party

2

"need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. <u>STATEMENT OF FACTS</u>

Plaintiff did not respond to defendant's statement of undisputed facts as required by Appendix II to the Uniform Initial Order Governing All Further Proceedings. (Doc. 10 at 16-17.) Appendix II states, "All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 10 at 17 [original emphasis omitted].) Therefore, the court deems the following facts admitted:

*<u>Background</u>*

1.      Odom (white, male) is a long time employee of the FBI and has been the AO [Administrative Officer] of the Birmingham Field Office ["BFO"] [since May 2005]. [(Doc. 33-1 at 10-11, 13.)]

2.      As AO of the Birmingham Field Office, Odom is a GS-14 supervisor and supervises[, directly or indirectly,] approximately 30 to 34 employees. [(*Id*. at 13, 16-17.)]

3

3.      According to Odom, the main duty of the AO is to act as the primary point of contact for the human resources division of the office.[2]  [(*Id.* at 16.)]

4.      Carmen Adams was the SAC [Special Agent in Charge] of the Birmingham Field Office from approximately 2003 until her retirement on March 31, 2009, and was Odom's second level supervisor from the time he became AO in 2005 until Adams' retirement in 2009.  [(*Id.* at 13, 14; doc. 33-22 ¶¶ 1, 3, 5.)]

5.      Prior to October 2008, Odom reported directly to ASAC [Assistant Special Agent in Charge] Charles Regan ("Regan").  [(Doc. 33-1 at 15.)]

6.      Robert Haley came to the Birmingham Field Office as an ASAC in October 2008 and, shortly after arriving, became Odom's direct supervisor. [(Doc. 33-3 at 327 and doc. 33-3, exh. 1, at 43.)]  Haley was Odom's direct supervisor until October 2009.  [(Doc. 33-2 at 29, 38.)]

7.      Patrick Maley came to the Birmingham Field Office as the SAC in July 2009 following Adams' retirement.  [(Doc. 33-4 ¶ 1.)]

8.      In October 2009 Odom began reporting directly to SAC Maley.  [(Doc. 20-1 Count Nine; doc. 33-4 ¶ 3.)]

. . .

---

[2]Plaintiff testified:

There are a number of duties as Administrative Officer, but the main duties would be as the primary point of contact for Human Resources for the division.

Budget matters, procurement, facilities management, oversight of information technology and other technical as well as day-to-day operation overall.  Operation of Support Services section for not only Birmingham, but the outlying resident agencies.

(Doc. 33-1 at 16.)  It appears to the court that there should have been a comma after the word "division" in the first paragraph.  In other words, his main duties included all the duties mentioned in the second paragraph.

*(Morale in the Birmingham office in 2008)*

10.     Haley testified that at the time he arrived in the Birmingham office in October 2008, the morale was the worst he had ever seen.  [(Doc. 33-2 at 42.)] There was poor communication and a lack of trust amongst the rank and file with their commanders at every level.  [(*Id.* at 42-43, 52-53.)]

11.     Examples cited by Haley of the bad morale included issues between ASAC Regan and Haley's predecessor, ASAC Keith Bryars . . .[, (*id.* at 42-43)]; issues between [a supervisor and an] agent[, (*id.* at 48-49)]; issues between Odom and SAC Adams[, (*id.* at 43-44, 53-55)]; and issues between Odom and his subordinates, including Laura Williford[, (*id.* at 92-94)].

*(History of conflict between Adams and Odom)*

12.     Although Adams was responsible for the selection of Odom as AO in 2005 and Odom's promotion from GS-13 to GS-14 approximately a year later[, (doc. 33-1 at 12, 14)], there was a history of conflict between Adams and Odom[, (doc. 33-2 at 53-54, 56-57, 67-68, 80-81, 83; doc. 33-5 at 1-2, 8-9.)]

13.     According to Regan, that history between Odom and Adams goes back to late 2005, and includes non-EEO issues involving a holiday work shift schedule and the promotion of Leon Cotton.  [(Doc. 33-5 at 2-3.)]

14.     Shortly after Haley came to the Birmingham office, Adams advised Haley that she regretted promoting Odom.  [(Doc. 33-2 at 67-68.)]  She told Haley that she thought Odom was an ineffective leader, that he managed by e-mail, and that he "delegated upwards routinely."  [(*Id.*)]  Adams also told Haley that she wanted him to fire Odom, but Haley expressly rejected that suggestion and never took any action to fire Odom.  [(*Id.* at 73-77.)]

*(Conflicts between Odom and employees he supervised)*

15.     Odom admits that in 2008 the FBI began conducting employee surveys to measure how employees felt about their supervisors.  [(*Id.* at 24.)]

16.     Odom admits that negative issues were raised in those employee surveys concerning his supervisory [demeanor and authority].  [(*Id.* at 24-25, 110-12.)]

5

17.     Odom also admits that, as a result of the employee surveys, Maley had a conversation with Odom about the need for Odom to gain the trust of some of the employees he supervised.  [(*Id*. at 25.)]

18.     Odom admits . . . two of the employees he supervised, Lorenza Moore and Laura Williford, requested in 2008 that they be removed from Odom's supervision.  [(*Id*. at 30, 113.)][footnote omitted]

19.     According to Haley, at one point he was advised that Williford's husband, who also worked in the Birmingham office, had to be talked out of going to Odom's office and getting into a physical altercation with Odom over the way Odom treated Williford.  [(Doc. 33-2 at 116-17.)]

20.     In 2009, Williford initiated an EEO complaint against Odom.  [(Doc. 33-1 at 21.)]

. . .

23.     Regan states that between December 2007 and March 2008:

> [T]he division held a session of the Employee Advisory Committee (EAC), which generated approximately twenty-seven issues for executive management attention.  Nearly all of the issues related to support employees [support employees are supervised by Odom].  The single biggest problem was the number of personnel who were involuntarily assigned to odd hour work shifts.  It has been my experience . . . that AO Odom has always represented that the support personnel in the division are happy, there were minimal complaints, and moral[e] was good.  I have suspected for some time that some of the support personnel did have complaints and concerns, moral[e] was low, and the results of the EAC supported that belief.

[(Doc. 33-5 at 5.)]

*(Agency's OPR Investigation of Adams)*

24.     Sometime after [his ADR in] May 6, 2008,[3] Odom reported concerns he had regarding Adams to the agency's Inspection Division [OPR].  [(Doc. 33-1 at 40-41; doc, 33-8 at 1.)]

25.     Not only did Odom allege EEO- related concerns regarding Adams, but Odom also alleged that Adams had issues involving alcohol abuse.  [(Doc. 33-1 at 40-42.)]

26.     An investigation was initiated by the Inspection Division concerning Odom's allegations regarding Adams.  [(Doc. 33-8 at 3-9.)] [footnote omitted]

27.     On February 27, 2009, the agency's Office of Professional Responsibility (OPR) issued its findings regarding that investigation and concluding (sic) that Odom's allegations regarding Adams were unsubstantiated.  [(*Id.* at 1, 9.)]

28.     Although OPR concluded that Odom's allegations against Adams were unsubstantiated, OPR did find that Adams "used inappropriate language in discussions with her Executive Management team when encouraging them to promptly address EEO concerns."  [(*Id.* at 1, 8-9.)]  OPR determined that Adams should receive non-disciplinary counseling regarding her use of words which might give the impression she was denigrating the EEO process.  [(*Id.* at 1, 9.)]

*(Agency's OPR Investigation of Odom)*

29.     Following the conclusion of the OPR investigation against Adams, a second investigation was initiated by Ryan Zarfoss of the agency's Internal Investigations Section.  [(Doc. 336-27 ¶¶ 2, 5.)]  The issue was whether Odom lacked candor concerning his allegations made during the investigation of Adams.  [(Doc. 33-9 at 1-2.)]

30.     On July 13, 2009, OPR issued its findings concerning the investigation regarding Odom and noted in its report that "certain sweeping statements in [Odom's signed sworn statement] reflect a disturbing carelessness."  [(*Id.* at

---

[3]See, *infra*, at 10, ¶¶ 48, 49, 50.

2.)]  However, OPR concluded that the evidence did not support a finding that Odom knowingly provided false information.  [(*Id*. at 12.)]  OPR requested that Odom receive non-disciplinary counseling "to emphasize the necessity of precision when making statements under oath, and when making statements to a Bureau employee in an authoritative position when questioned about his or another's conduct."  [(*Id*. at 2; *see also* doc. 33-1 at 93.)]

## *Odom's Prior Participation in Protected EEO activity*

31.    Odom's alleged participation in protected EEO activity is set out in his Amended Complaint at paragraphs 9-16.  For purposes of Defendant's motion for summary judgment, Defendant does not challenge Odom's allegations regarding his participation in said protected activity. [footnote 6]

> [Footnote 6] Although it does not appear from Odom's deposition testimony[, (*see* doc. 33-1 at 132-39),] that he was engaged in protected EEO activity during the March 28, 2007, meeting described in paragraph 9 of his Amended Complaint, he alleges he contacted EEO counselor Moore shortly after that meeting and discussed EEO concerns with him.  Therefore, for purposes of this motion only, Defendant does not challenge Odom's assertion that he engaged in protected activity in March 2007.

## *Odom's Exhaustion of Administrative Remedies*

32.    Odom initially chose to address the 2007 quality step increase ("QSI") issue made the basis of Count One of his complaint at an ADR mediation on May 6, 2008.  [(Doc. 33-1 at 44-45.)]

33.    Odom did not seek informal EEO counseling regarding any of the issues in his complaint until November 26, 2008.  [(*See* doc. 33-10 at 2.)]

.34.    Defendant's Exhibit 10 is a true and correct copy of the formal administrative EEO complaint Odom submitted to the FBI on January 6, 2009. [(Doc. 33-1 at 31 and exh. 2 at 46-48.)]

35.    Defendant's Exhibit 11 is a true and correct copy of the Letter of Acceptance notifying Odom of the issues accepted by the agency for investigation pertaining to his administrative EEO complaint.  [(Doc. 33-1 at 31 and exh. 3, at 50-54.)]

36.     Defendant's Exhibit 12 is a true and correct copy of the FBI's Final Agency Decision regarding Odom's administrative EEO complaint.  [(Doc. 33-1 at 39 and exh. 5 at 66-67.)]

. . .

*Odom's Allegations Against Adams (Counts One - Six)*

*(Count One - The 2007 QSI issue)*

42.     In Count One, Odom alleges that Adams retaliated against him when he was not selected to receive a QSI in 2007.[4]  [(Doc. 20-1 ¶ 151; doc. 33-1 at 43-44.)]

43.     Odom admits that he was one of nine non-agent employees nominated for a QSI in 2007 and that a career board panel was convened to select five of the nine nominees for the 2007 QSI awards.  [(Doc. 33-1 at 49-52; *see also* doc. 33-15 at 32; doc. 33-22 ¶ 6; doc. 33-14.)]

---

[4]According to the HR Order - DOJ 1200.1:

Quality Step Increase (QSI) is an increase in an employee's rate of basic pay from one step or rate of the grade of his or her position to the next higher step of that grade or next higher rate within the grade.   The QSI provides faster than normal progression through the step rates of the General Schedule. Unlike other forms of monetary recognition, a QSI permanently increases an employee's rate of basic pay by one step.  No more than one QSI may be granted to an employee in the same 52-week period.  In order to be eligible for a QSI, the employee's most recent rating of record must be at the highest level permitted under the component's performance program description.   The employee must have been performing at that grade for a minimum of six months and there is an expectation that the performance will continue at that level for a minimum of an additional six months.

HR Order 1200.1, Chap. 2-18, Agency Awards and Quality Step Increases: *B. Policy*, *found at* http://www.justice.gov/jmd/hr/hrorder/chpt2-18.htm.7.  Plaintiff testified that the QSI was "an award . . . for outstanding performance for the previous work year," and "an award board panel" decided "who would receive and would who not receive" a QSI.  (Doc. 33-1 at 47-48.)

44.     Odom admits that Adams was not on the career board panel.  [(Doc. 33-1 at 48.)]  Odom also admits that he does not allege any member of the career board panel discriminated against him.  [(*Id.* at 50.)]

45.     Odom admits that he was not one of the five employees selected by the career board panel for a QSI award in 2007.  [(*Id.* at 51.)]

46.     Odom further admits that he has no facts, either direct or indirect, to support any belief that Adams influenced the career board panel in its selection of the 2007 QSI recipients.  [(*Id.* at 51-52; doc. 33-15 at 33-34.)]

47.     A memo of the career board's meeting concerning the 2007 QSI awards is submitted as Defendant's Exhibit 13. As evidenced by that memo, although Odom was one of the nine non-agent employees nominated for a QSI, he was not among the five selected by the career board panel to receive a QSI award in 2007.  [(Doc. 33-14 at 1-2, 3; *see also* doc. 33-22 ¶ 6.)]

48.     . . . Odom admits that on January 8, 2008, he became aware that he was not going to receive the QSI award made the subject of Count One. [(Doc. 33-1 at 44.)]

49.     Instead of initially pursuing an EEO complaint regarding the QSI issue, Odom requested mediation through the Alternative Dispute Resolution [ADR] process.  [(*Id.* at 44-45; doc. 33-16 at 5-6.)]

50.     Mediation was conducted on May 6, 2008 in Washington, D.C. regarding the 2007 QSI issue.  [(*Id.* at 45.)]

51.     That mediation was unsuccessful and Odom was aware of that fact at the conclusion of the May 6, 2008, mediation.  [(*Id.* at 46.)]

52.     Although Odom was provided a Notice of Right to File[, (doc. 33-24 at 2-3,] following that mediation, Odom did not initiate any administrative EEO complaint until January 6, 2009. [(Doc. 33-1 at 46-47 and exh. 2 at 47; doc. 33-11 at 1.)]

53.     Odom's January 6, 2009, administrative EEO complaint did not specifically address the 2007 QSI issue, nor was the QSI issue listed among

the issues accepted by the agency for investigation.[5]   [(Doc. 33-11 at 1-3; doc. 33-12 at 1-2.)]

54.   Even if Odom's January 6, 2009, administrative EEO complaint had included the QSI issue, he did not bring that issue as an administrative

---

[5]The letter of accepted issues stated as follows:

Accepted for investigation are the following allegations:

Whether the complainant was discriminated against based on reprisal for his prior participation in protected activity when:

    (1)    on September 24, 2008, and October 24, 2008, complainant was removed from handling administrative/procurement matters for an employee;

    (2)    on October 29, 2008, the [ASAC] told complainant that the [SAC] had a "trust problem" with complainant because of his involvement in a previous EEO matter, and that complainant must do what ever [sic] it takes to regain her trust;

    (3)    on November 24, 2008, complainant was notified that the [IT] staff was removed from his supervision and reassigned to the ASAC, which he believes could cause an adverse impact on his GS grade level.

In addition to the above allegations, which have been accepted for investigation, you also allege you were discriminated against based on reprisal for your prior participation in protected EEO activity when:

    (4)    on May 15, 2008, complainant learned that a GS-12 Photographer was removed from his supervision.

Allegation numbered (4) is a discrete action that is untimely.  . . .

(Doc. 33-12 at 1-2.)

complaint within the 15 day deadline prescribed by 29 C.F.R. § 1614.105(d) and (f) following the conclusion of the ADR mediation on May 6, 2008. [(Doc. 33-27 at 2; doc. 33-11 at 1 [administrative complaint "[d]eemed filed" on January 6, 2009].)]

*(Count Two - The reassignment of Lorenza Moore to another supervisor)*

55.    In Count Two, Odom alleges that Adams retaliated against him on May 6, 2008, when Lorenza Moore was removed from Odom's supervision. [(Doc. 20-1 ¶ 153.)]

56.    Adams and Moore each state in their respective declarations, and Odom admits, that Moore requested to be removed from Odom's supervision. [(Doc. 33-1 at 61-62, 113; doc. 33-6 at 5; doc. 33-22 ¶ 7.)]

57.    In his sworn statement, Moore testifies that "[u]ntil the summer of 2008, I reported directly to AO Odom.  I was transferred out from under his supervision based on my own request to executive management for the change. I now report to the SSA [Supervisory Special Agent] of the VCMO [Violent Crime Major Offender Squad] who supervises ERT [Evidence Response Team], which makes sense to me because 95 percent of my duties as photographic coordinator and ERT team leader are operational and not administrative.  The change in supervision has been very positive for me and field office agent personnel."  [(Doc. 33-6 at 5; doc. 33-22 ¶ 7.)]

. . .

59.    Odom admits that he did not suffer any economic or other tangible loss as a result of Moore being removed from his supervision.  [(Doc. 33-1 at 62; *see also* doc. 33-22 ¶ 7.)]

. . .

*(Count Three - Odom's 2008 Annual Performance Review)*

61.    In Count Three, Odom alleges that Adams retaliated against him regarding his annual performance review rating for FY 2008.  [(Doc. 20-1 ¶ 155; doc. 33-1 at 64.)]

62.     All FBI employees receive an annual performance review and rating by their direct supervisor for each fiscal year.  [(Doc. 33-1 at 64.)]

63.     There are five possible ratings. From best to worst those ratings are Outstanding, Excellent, Successful, Minimally Successful, and Unsatisfactory. [(*Id*. at 64-65.)]

64.     Charles Regan was Odom's rating official for the FY [fiscal year] 2008 rating made the subject of Count Three.  [(*Id*. at 64; doc. 33-25 ¶ 3.)]

65.     Regan gave Odom an "Excellent" rating for FY 2008.  [(Doc. 33-1 at 64.)]

66.     Even though Odom received an 'Excellent" rating for FY 2008, the second highest rating possible, his contention is that he would have had a "better opportunity" to have received an "Outstanding" rating if Adams had not "restricted [his] ability to make decisions and assign employees to the duties which [he] had previously been able to do."  [(*Id.* at 65-66.)]

. . .

68.     Odom admits that he does not know whether Regan gave any other employee an "Outstanding" rating for FY 2008.  [(*Id*. at 66.)]

69.     Odom admits that he [can only speculate] that Adams interceded or otherwise influenced Regan regarding the FY 2008 performance appraisal made the basis of Count Three.  [(*Id.* at 71.)]

70.     Adams confirms that she was not Odom's rating official and that she did not suggest that Odom's 2008 performance rating be downgraded.  (Doc. 33-22 ¶ 8.)]

71.     Odom admits that Adams signed off on a cash award that he received for FY 2008.  [(Doc. 33-1 at 70-71.)]

72. Prior to 2008, Odom had not routinely received "Outstanding" performance ratings.  Although Odom had received an "Outstanding" rating in FY 2007, he admits that he received an "Excellent" rating for FY 2006, and a "Meets Expectations" rating for FY 2004.  Odom's rating for FY 2005 was

13

unavailable and he does not recall what that rating was.  [(*Id.* at 69; *see also id.*, exh. 9, at 103-04.)]

73.     As evidenced by the written performance review, Regan's 2008 review of Odom was generally positive.[6]  [(Doc. 33-26.)]  However, Regan [noted] that Odom "[displays a reluctance and lack of confidence to make either routine or difficult decisions on his own]." [(*Id.* at 3; *see also* doc. 33-25 ¶ 3.)] Regan also noted that Odom "has a tendency of communicating through email. On one occasion, he was challenged by a subordinate employee regarding upward mobility.  Instead of meeting with the employee to discuss the issue, he chose to debate her through a series of emails, even though he was provided with guidance by the EM [executive management] that he might want to consider discussing the issue with her in person." [(Doc. 33-26 at 3-4; *see also* doc. 33-25 ¶ 3.)]

74.     Odom admits that the only potential harm he received as a result of being rated "Excellent" versus "Outstanding" is that an employee has to receive an "Outstanding" rating in order to be eligible for consideration for a discretionary QSI.  [(Doc. 33-1 at 71-72.)]

75.     Although Odom was aware of his FY 2008 rating somewhere between ["]mid-October["] and the ["]first of November["] 2008[, (*id.* at 67)], he did not address the FY 2008 rating in his administrative EEO complaint which he submitted on January 6, 2009[, (doc. 33-11)].

(*Count Four - The temporary transfer of IT staff to another supervisor*)

76.     In Count Four, Odom alleges that Adams retaliated against him in November 2008 when she transferred the four employees in the Information Technology ("IT") Unit from Odom's supervision to another supervisor. [(Doc. 20-1 ¶ 157; doc. 33-1 at 72.)]

77.     Those four IT employees included Laura Williford, who had been the IT supervisor. [(Doc. 33-1 at 72.)]

---

[6]Regan testified that he gave plaintiff an "Outstanding" PAR for the year before "because of his increased responsibilities arising from the construction of an annex onto the BFO building," and he "believed that the successful outcome of that project warranted this notation."  (Doc. 33-25 ¶ 4.)

78.     As the IT supervisor, Williford directly supervised the other three employees in the IT Unit and reported directly to Odom. Odom was the second level supervisor over those three employees.  [(*Id*. at 72-73.)]

79.     Shortly prior to the November 2008 transfers made the subject of Count Four, Williford had advised management that she suffered from fibromyalgia and that her medical condition was made worse by stress.  [(*Id*. at 75-76; doc. 33-2 at 92-93; doc. 33-22 ¶ 9.)]

80.     Williford had also advised management that Odom was the cause of her stress and that she needed to temporarily step down from her supervisory position and take some time off. [(Doc. 33-2 at 93-94; doc. 33-22 ¶ 9; doc. 33-17 at 1-2.)]

81.     Williford advised management that she could not take Odom's supervision anymore and asked that she and the other IT personnel be supervised by ASAC Regan rather than Odom.  [(Doc. 33-18 at 11.)]

82.     In advising management officials that Odom was the cause of her stress and was exacerbating her medical condition, Williford expressed concern that Odom would retaliate against her if he found out that she was complaining about him.  [(Doc. 33-2 at 94-95; doc. 33-18 at 11-12.)]

83.     Based on Williford's request for accommodation, a decision was made to temporarily move the IT staff, including Williford, to ASAC Regan's supervision.  [(Doc. 33-2 at 95-96, 139-40; doc. 33-3 at 355-56, 359; doc. 33-22 ¶ 9; doc. 33-18 at 12-13.)]

84.     Because of Williford's request that Odom not be advised of her complaints about him, a decision was made to tell Odom and the staff that the move was being made because of a desire to put the IT staff together with the electronic technician ("ET") staff, whom Regan already supervised.  [(Doc. 33-2 at 139-40; doc. 33-3 at 351-52.)]

85.     Although Odom initially voiced concerns to Haley that the transfer of the IT staff might result in his GS-14 position being downgraded, Haley reassured him on more than one occasion that would not happen and that the transfer was only temporary.  [(Doc. 33-3 at 249-51, 345-47, 399-400.)]

86.   . . . [O]n April 2, 2009, the IT staff was transferred back to his supervision.  [(Doc. 33-1 at 80.)]

87.   Odom also admits that on April 2, 2009, not only were the four IT staffers transferred back to his supervision, but on that date he also received supervisory authority over the ET staff and the Telecommunication Manager, whom he had never supervised in the past.  (*Id*.)

(*Count Five – Private text messages between Moore and Mathis*)

88.   Count Five involves private text messages sent between two non-supervisory employees, Lorenza Moore and Tammy Mathis.  [(Doc. 20-1 ¶ 159; doc. 33-1 at 85-86.)]

89.   The text messages referred to in Count Five are set out in Odom's response to interrogatories, Defendant's Exhibit 18.  [(Doc. 33-19; *see also* doc. 33-1 at 86-87.)]

90.   Odom became aware of those text messages through the FBI's response to requests for production in another case in this district . . . .  [(Doc. 33-1 at 87-88.)]  . . .

91.   Odom is not mentioned by name in any of the text messages, and he can only speculate about whom any such message was referring.  [(*Id.* at 88-89.)]

(*Count Six - Administrative Inquiry by Internal Inspection Division*)

92.   In Count Six, Odom alleges he was retaliated against by Adams, Moore, and Mathis through an administrative inquiry (OPR) in February 2009.  [(Doc. 20-1 ¶ 161; doc. 33-1 at 91-92.)]

. . .

94.   Neither Adams, Haley, nor Maley initiated the administrative inquiry made the subject of Count Six.  [(Doc. 33-3 at 401-02; doc. 33-22 ¶ 11.)]

95.   Instead, the administrative inquiry was initiated by Ryan Zarfoss, of the agency's Internal Investigations Section, following Zarfoss's observations during his investigation of Adams.  [(Doc. 33-27 ¶¶ 3, 5.)]

96.    The administrative inquiry did not result in any disciplinary action against Odom.  [(*See* doc. 33-9 at 1.)]

*Odom's Allegations Against Haley (Counts Seven - Eight)*

   *(Count Seven - Haley's comment at a management meeting regarding EEO complaints)*

97.    Odom alleges in Count Seven that he was retaliated against in September 2009 when, at a supervisor's retreat, Haley made a comment about "frivolous EEO and OPR complaints." [(Doc. 20-1 ¶ 163; doc. 33-1 at 96-97.)]

98.    According to Odom, prior to the retreat he had heard "that there were trust issues [in the Birmingham office] going back for 10, 15, 20 years, and [he] had requested to know what those trust issues were [so we could deal with them and could address then and move on]."  [(Doc. 33-1 at 97.)]

99.    According to Odom, when the issue of trust again came up during the supervisory retreat, he "asked the question what is meant by going back 10, 15, 20 years … [at which point] Haley interrupted and said … the morale issues on the support side of the house in the Birmingham Division are because of frivolous EEO and OPR complaints."  [(*Id.*)]

100.    Odom admits that Haley did not identify which EEO complaints he was referring to. [(*Id.* at 98.)]

101.    According to Haley, at the time of the supervisory retreat made the basis of Count Seven, there were approximately five EEO complaints and three to four OPR complaints that were pending or that had been made since he arrived in the Birmingham office, including the EEO complaint by Williford against Odom.  [(Doc. 33-3 at 296-97; *see also* doc. 33-1 at 99.)]

. . .

103.    Although Haley does not recall using the word "frivolous" during that supervisory retreat, he explained that he did comment about EEO matters and was attempting to address the overall trust issue which he and Maley had observed in the office since their arrival.  [(Doc. 33-3 at 289-94.)]

104.   Haley recalls that, at the retreat, he "said words to the effect … [that] part of the problem that we have and the breakdown of trust is that people are relying on civil processes, be they EEO or OPR, we are flinging things out of our division without giving each other the benefit of sitting down face to face or man to woman to at least give each other the professional courtesy of trying to work through our differences and come to some common ground." [(*Id*. at 294.])

*(Count Eight - Odom's 2009 Annual Performance Review)*

105.   Odom alleges in Count Eight that he was retaliated against when he received an "Excellent" rather than an "Outstanding" annual performance rating from Haley for FY 2009. [(Doc. 20-1 ¶ 165; doc. 33-1 at 103.)]

. . .

107.   As evidenced by the overall narrative at page 3 of Odom's 2009 performance review[, (doc. 33-20 at 3)], Haley described Odom's performance in a very positive manner, but noted that he encouraged Odom "to meet in person with fellow employees and subordinates, where possible, versus 'management by email'… [and] visit RA support personnel 'in person' during regularly scheduled visits to each and every RA."  There is also a general reference to FY 2009 construction projects and the development of a Professional Support Employee Relief Supervisor program which were not completed during FY 2009.  [(*Id*.)]

108.   In his deposition, Haley further explained that he felt Odom needed to improve his communication skills in relation to "management by E-mail." [(Doc. 33-2 at 128-29.)] Haley felt that communicating by email can cause misinterpretations and Haley discussed this with Odom on a number of occasions.[7]  [(*Id*.)]

109.   In spite of the fact that Odom now contends he should have received an "Outstanding" rating for FY 2009, he admits that "after 2008 there was a downward trend of the favorability on my climate survey."  [(Doc. 33-1 at 24-25, 110.)]

---

[7]Haley testified, "[T]o me, effective leadership is not done by E-mail, and [plaintiff] and I had conversations about that."  (Doc. 33-2 at 129.)

_Odom's Allegations Against Maley (Counts Nine - Thirteen)_

_(Count Nine - Change of supervisor from Haley to Maley)_

110.    In Count Nine, Odom alleges that SAC Maley retaliated against him in October 2009 when Maley took over as Odom's direct supervisor.  [(Doc. 20-1 ¶ 167; doc. 33-1 at 104.)]

111.    Odom admits that ["at least some other AO's around the court directly reported to the SAC."]  [(Doc. 33-1 at 105.)]

112.    ASAC Haley testified that, prior to SAC Maley's decision to directly supervise Odom, Odom had specifically suggested to Haley that he (Odom) should report to the SAC rather than to an ASAC.  [(Doc. 33-3 at 397-99.)]

113.    When asked at [his] deposition how he was harmed by SAC Maley becoming his direct supervisor, Odom stated that Maley exercised "increased oversight" over him and that Maley "got more heavily involved in the decision making process on procurement . . . ."  [(Doc. 33-1 at 116-17.)]

114.    In regard to Odom's complaint that Maley was more involved in Odom's daily activities than Haley had been, Haley testified that it was Maley's general supervisory style to micro-manage and that he (Haley) and other managers besides Odom felt that Maley micro-managed them as well. [(Doc. 33-3 at 250-53.)]  In that regard, Haley described Maley as an "equal opportunity micro manager."  [(_Id._ at 251.)]

115.    Odom testified that the reason Maley told him the change in supervisors was being made was because Maley wanted to "have a closer interaction with the Support Services section in order to alleviate any perceived concerns by the staff."  [(Doc. 33-1 at 108.)]

116.    Maley explains that, after his arrival at the Birmingham office, he had individual discussions with many of the Birmingham Field Office employees and became aware of a morale problem among the support staff, including trust issues.[8]  [(Doc. 33-4 ¶ 4.)]  In order "[t]o bring a new perspective on how

_____

[8]Maley testified:

the Support employees were being managed, [he] decided to bring [Odom], who was in charge of the Support employees, under [his] direct supervision." [(*Id*.)]

117.    Maley also states that[,] before making any changes, he discussed with Odom his idea of bringing Odom under his direct supervision and that [Odom "was extremely supportive of this idea  . . . and at no point did the Plaintiff ever indicate he was opposed to this change in supervision." (*Id*.)]  In fact, according to Maley, Odom stated that reporting directly to SAC Maley rather than ASAC Haley ["would  . . . elevate the AO position to executive management with the BFO, since he would then be answerable to me, the SAC, and the AO position would be on par with the ASAC positions." (*Id*.)]

(*Count Ten - Weekly budget meetings and discretionary funds*)

118.  In Count Ten, Odom alleges that Maley retaliated against him beginning in 2009 by excluding him from routine weekly budget meetings and

---

After my arrival to the BFO, I systematically engaged every work unit using a standard interview questionnaire, as well as having individual meetings with the entire management team to assess the division's strengths and weaknesses. The systematic approach also included many of the Support (non-Agent) employees under the Plaintiff's supervision.  From my discussions, I realized there was a morale problem among the Support employees under AO Odom's leadership, which only confirmed recent division-wide climate and leadership surveys.  There was a lack of trust of support managers, most notably AO Odom.  To bring a new perspective on how the Support employees were being managed, I decided to bring the AO, who was in charge of the Support employees, under my direct supervision.  At this time, the Plaintiff was the AO for the Support employees in the Support Services Section (SSS).  Before making any changes, I repeatedly discussed my idea with the Plaintiff about supervising him directly.  The Plaintiff was extremely supportive of this idea, as [were] both ASACs, and at no point did the Plaintiff ever indicate he was opposed to this change in supervision.  AO Odom actually stated this would also elevate the AO position to executive management within the BFO, since he would then be answerable to me, the SAC, and the AO position would be on par with the ASAC positions.

(Doc. 33-4 ¶ 4.)

20

reducing the limit of discretionary funds he was authorized to allow without higher approval.  [(Doc. 20-1 ¶ 169; doc. 33-1 at 117-18.)]

119.    During his deposition, Odom clarified that he is referring to weekly budget meetings that are held between Haley (not Maley) and the financial manager.  [(Doc. 33-1 at 118-19.)]

120.    Odom admits that up until 2009, he was the direct supervisor over the financial manager.  [(*Id*. at 119-20.)]

121.    Odom admits that in 2009, the FBI implemented a nationwide policy prohibiting an AO with procurement authority, such as Odom had, from supervising a financial manager.  [(*Id*. at 119.)]  As a result of that nationwide policy, sometime in 2009 Odom no longer supervised the financial manager. [(*Id.* at 120.)]

122.    Haley testified that the weekly budget meetings he holds with the financial manager generally last no longer than ten minutes[, [(doc. 33-2 at 221)], that they are "not real substantive"[, (*id.* at 211), and that he has never told Odom that he could not attend those meetings[, (*id.* at 213)].[9]

123.    Maley states that he never excluded . . . Odom from any weekly budget meetings.  [(Doc. 33-4 ¶ 5.)]

124.    Odom is supplied with weekly [financial] budget reports.  [(Doc. 33-2 at 211.)]

---

[9]Haley testified that he meets with the financial manager at 9:00 a.m. every Monday morning before meeting with his other supervisors.  (Doc. 33-2 at 210.)  The meetings with the financial manager "never have lasted more than ten minutes.  They're usually a quick touch the base, how was your weekend, any issues I need to know about . . . before we get going on the week . . . .  They're not real substantive."  (*Id*. at 210-11.)  He said these meetings were part of Maley's requirement that the ASACs and the AO meet with him every week to let Maley know "if there's anything within [the ASACs' or the AO's] branch that . . . is going to be newsworthy for the week, any issues that [we] were engaged with headquarters on that he might be getting a telephone call from his level . . . executive level . . . so that there were no surprises."  (*Id*. at 217-18.)  Therefore, the ASACs and the AO were required to meet with their subordinates to determine if they had information that Maley would want to know.  (*Id*.)

125.   Regarding the discretionary fund issue, Odom says that prior to 2009 he had authority to approve up to $25,000 for office purchases out of the discretionary fund, but in 2009, that authority was lowered to $250.  Anything more had to be approved by Haley.  [(Doc. 33-1 at 122.)]

126.   Odom admits that, prior to the 2009 reduction in his procurement authority, there had been problems with shortfalls in the discretionary fund account.  [(*Id*. at 122-23.)]

127.   Maley explained that because of those shortfalls and "[in tight budgetary times he] needed one person to [see] all requests [for funds] so we could make the best cost/benefit decisions in how we spend finite resources." [(Doc. 33-4 ¶ 5.)]

>   *(Count Eleven - February 6, 2010 email from Maley regarding the Support Services Section)*

128.   Odom alleges in Count Eleven that Maley retaliated against him on February 6, 2010, when Maley sent an email[10] advising that he was assuming

---

[10]This email stated:

The HQC [Headquarter City] support concerns generally pertain to trust issues, which were driven by many factors.  These factors have a genesis in fact, as well as perception.  Rather than going backwards to dredge up the complex factors that got us to this point, it is best to describe what the SAC expects and build the processes around expectations to support a better trusting work environment in the future.  Leaders will be positive and develop a positive & respectful work environment.  The key is open communications and transparency to ensure full engagement of all employees, as well as minimize ambiguity or misperceptions.  Leaders have to get the mission accomplish[ed], and positively develop their people and work environment at the same time. Leaders must do both.

Specific steps to move for:

1)  the SAC has assumed direct supervision over the SSS [Support Services Section] in HQC.

direct supervision over the Support Services Section. Odom then states in Count Eleven that this effectively removed his primary duties.  [(Doc. 20-1 ¶ 171; doc. 33-1 at 126.)]

129.    Contrary to Odom's assertions in Count Eleven, he admits that after February 6, 2010, he continued to directly supervise the employees in the Support Services Section and continued to be the rating official for those employees.  [(Doc. 33-1 at 125-27.)]

130.    Maley confirms that he never assumed direct supervision over the Support Services Section employees and that the only change was that he assumed direct supervision over Odom as discussed under Count Nine, above. [(Doc. 33-4 ¶ 6.)]

*(Counts Twelve and Thirteen– Odom's 2010 and 2011 Annual Performance Reviews)*

131.    In Counts Twelve and Thirteen, Odom claims that Maley retaliated against him concerning his 2010 and 2011 annual performance ratings. Although Maley gave Odom an "Excellent" rating for each of those years, Odom contends he was retaliated against because he did not receive an "Outstanding" rating.  [(Doc. 20-1 ¶¶ 173, 175; doc. 33-1 at 130-31.)]

132.    Odom admits that he does not know of any employee who received an "Outstanding" rating from Maley for FY 2010 or 2011.  [(Doc. 33-1 at 130-31.)]

133.    Maley states that he did not downgrade Odom's 2010 or 2011 performance rating because of Odom's involvement in any protected EEO activities.  [Doc. 33-4 ¶¶ 7,8.)]  He explains that, although Odom adequately performed his duties, he did not consider giving Odom an "Outstanding" rating since he was aware of some issues with Odom's ability to effectively communicate with support employees.  [(*Id.*)][11]

--------

. . .

(Doc. 33-3, exh. 13, at 51-52.)

[11]Maley testified that plaintiff's "mid fiscal year performance meeting and his annual PAR contained specific data clearly documenting that his performance was never at an

(Doc. 32 at 8-35 [footnotes added; original footnotes deleted except as set forth herein].)

### III. DISCUSSION

### A.  FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Plaintiff's Amended Complaint contains a number of retaliation claims brought pursuant to Title VII.  As a federal employee plaintiff must exhaust such claims before filing a Complaint in Federal Court.

Before bringing a Title VII action in court, a federal employee must first seek relief from the agency where the alleged discrimination occurred. *Brown v. General Servs. Admin.*, 425 U.S. 820, 832, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976).  "This requirement is not a technicality; '[r]ather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel primary responsibility for maintaining nondiscrimination in employment.'"  *Grier v. Secretary of Army*, 799 F.2d 721, 724 (11th Cir. 1986)(quoting *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983)).  In accordance with the congressional design, the Equal Employment Opportunity Commission ("EEOC") has adopted regulations setting forth the procedure that employees must follow in presenting discrimination claims to federal agencies.  *See* 29 C.F.R. § 1614.101 *et seq*. These regulations provide, *inter alia*, that an aggrieved employee must "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ."  29 C.F.R. § 1614.105(a)(1).  . . .

If informal attempts to resolve the complaint are unsuccessful, the employee may file a formal complaint with the agency.  29 C.F.R. § 1614.106. If the agency dismisses the complaint for failure to comply with any of the time limits provided for in the regulations, including the 45-day rule [29 C.F.R. § 1614.107(a)(2)], the agency will issue a final decision and that decision may be appealed to the EEOC.  29 C.F.R. § 1614.110(b).  A decision by the EEOC on appeal is final unless either party files a motion for

---

Outstanding rating.  Quite frankly, he was always borderline Fully Successful and Excellent during his rating meetings, and I gave him [the] benefit of the doubt and rated him Excellent."  (Doc. 33-4 ¶ 6; *see also id*. ¶ 7.)

reconsideration within 30 days.  29 C.F.R. § 1614.405(b).  Throughout the administrative process, the employee must provide all relevant and available information so the agency and the EEOC have notice of the claim being pursued and can properly investigate and consider it.  *See Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999).

An employee who has completed the administrative process and obtained an unfavorable final decision may bring a Title VII action in district court, where he is entitled to a *de novo* review of his complaint.  *See Moore v. Devine*, 780 F.2d 1559, 1562 (11th Cir. 1986).

*Ramirez v. Secretary, U.S. Dept. of Transp.*, 686 F.3d 1239, 1243-44 (11th Cir. 2012).

Defendant contends that plaintiff failed to timely exhaust his administrative remedies as to the adverse actions set forth in Counts One, Two, and Three.  (Doc. 32 at 42-43, 44-45, 47.)  In response, plaintiff argues:

The government spends a portion of their brief to discuss whether Mr. Odom satisfied all the administrative requirements to pursue a few of his claims before this Court.  The chronology establishes that Mr. Odom satisfied the administrative requirements.  On November 20, 2007, SAC Adams called Odom into her office to pressure him about his decision about whether he would file an EEO complaaint.  The same day the QSI Board met to make recommendations to her.  On November 28th, Odom contacted an EEOC counselor, Nancy Huffstetler.  Odom was then allowed 45 days for any informal resolutions to be scheduled.  The FBI did not conduct a mediation until May 6, 2008.  The retaliatory and hostile workplace activities were of a continuing nature, as demonstrated by the removal of the information technology section on November 24, 2008, and the numerous hostile workplace acts recited herein.  Odom filed the formal complaint on January 6, 2009, which was well within the deadline.

(Doc. 34 at 23 n.7 [internal citation omitted].)  The court finds that plaintiff's Counts One, Two, and Three – alleging discrete retaliatory acts – are due to be dismissed based on plaintiff's failure to exhaust these claims.

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within [the time allowed by law] or lose the ability to recover for it." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Related discrete acts do not form "a single unlawful practice for the purposes of timely filing." *Id*. at 111 (citing 42 U.S.C. § 2000e–6(a)).  However, under certain circumstances individual discrete acts may be considered as part of a hostile work environment claim.  The Eleventh Circuit explained:

> In *National Railroad Passenger Corp. v. Morgan*, . . . the Supreme Court set forth general principles to determine whether timely acts can save non-timely acts.  It held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. The limitations period begins running the day the discrete act occurs.  In contrast, hostile work environment claims continue to occur over time.  Thus, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability if an act relating to the claim occurred within the filing period.

> Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim.  The pivotal question is whether the timely discrete acts are sufficiently related to the hostile work environment claim.

*Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349-50 (11th Cir. 2007)(quoting *Morgan*, 536 U.S. at 113)(internal quotations omitted).  To determine whether the discrete acts are part of a hostile-work environment claim, the court considers whether the discrete acts involve "the same type of 'discriminatory intimidation, ridicule, and insult'" as the hostile work environment claim.  *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

26

(1993)); *see also McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008)("[D]iscrete acts . . . must be challenged as separate statutory discrimination and retaliation claims;" they "cannot be brought under a hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult." (citing *Morgan*, 536 U.S. at 111-13, 116))(internal quotations omitted).

Whether the discrete acts can be considered as part of plaintiff's retaliatory harassment claim is discussed below.  However, plaintiff's Amended Complaint lists separate and discrete claims of retaliation based on the 2007 QSI, (doc. 20-1 ¶ 151); the removal of Moore from his supervision, (*id*. ¶ 153); and his Excellent 2008 PAR, ( *id*. ¶ 155).  As plaintiff does not argue that these claims were timely exhausted, except as part of his hostile workplace claim, defendant's Motion for Summary Judgment on the discrete claims set forth in Counts One, Two, and Three, will be granted and these claims will be dismissed.

## B.  REMAINING CLAIMS

### 1.  Discrete Claims

In order to establish a prima facie case of retaliation in violation of Title VII, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal relationship between the protected expression and the adverse action.  *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).  A "statutorily protected expression" includes activities falling with the "Opposition Clause," which protects an employee who "has opposed any practice made an unlawful employment practice by [Title

VII]," as well as activities falling with the "Participation Clause," which protects an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *EEOC v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)(quoting 42 U.S.C. § 2000e-3(a)).  To show an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)(internal quotations and citations omitted).  The Supreme Court used the term "material adversity' because [it stated that it] believe[d] it [was] important to separate significant from trivial harms." *Id*. at 68.

"Once a prima facie case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action." *Abernathy v. Science Applications Intern. Corp.*, No. 1:11-cv-03805-AKK, 2013 WL 6904089, *17 (N.D. Ala. Dec. 31, 2013)(citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).  "[I]f a plaintiff employee makes out a prima facie case, and the employer articulates a legitimate, non-discriminatory reason for the action, the plaintiff must then show, by a preponderance of the evidence, that the reason is pretextual." *Putman v. Secretary, Dept. of Veterans Affairs*, 510 Fed. Appx. 827, 830-31 (11th Cir. 2013)(citing

*McDonnell Douglas*, 411 U.S. at 802; *Crawford*, 529 F.3d at 976)(internal citations omitted).[12]

### a. Count Four – IT Staff

In Count Four of plaintiff's Amended Complaint, plaintiff alleges, "The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Adams['s] retaliatory animus on November 24, 2008, SAC Carmen Adams removed from supervision of Plaintiff all four employees of the Information Technology staff." (Doc. 20-1 ¶ 157.)  Defendant contends –

> Odom admits that Laura Williford, the IT supervisor who reported to Odom, had requested a transfer as part of an accommodation based on her medical condition.  Williford told management that her condition was exacerbated by stress and that Odom was causing her undue stress.  Based on Williford's request, the decision was made to temporarily transfer Williford and the IT staff to another supervisor to allow Williford an opportunity to recover from her condition and to reassess the situation at a later date.  Not only was the IT staff returned to Odom's supervision approximately four months later, but Odom was also assigned supervisory authority over the electronic technicians and the telecommunications manager, whom he had not previously supervised.  Based on these facts, the transfer made the basis of Count Four was not materially adverse to Odom, especially in the context of these facts.  Additionally, these facts present a legitimate, non-discriminatory reason for the transfer which Odom cannot refute.

(Doc. 32 at 49 [internal citations omitted].)

Plaintiff responded:

---

[12]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it.  ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***."  11th Cir. R. 36-2 (emphasis added).

In the ongoing battle with SAC Adams over . . . Odom's participation in the EEO process, Adams removed the entire information technology team from Odom's span of control despite the fact that Odom's GS-14 position and job description required Odom to supervise them.  [citation omitted]  The removal of this group of employees combined with Moore's removal, meant that SAC Adams removed approximately 15% of Odom's subordinates from his span of control.  ASAC Haley testified that even he could "understand how AO Odom could perceive the SITS reassignment as a retaliatory act against him." [citation omitted][Footnote 8]

> [Footnote 8]  It is interesting to note that Haley's original approach to explain the move of the information technology section was to tell Odom an outright lie.  Signed Sworn Statement of Robert E. Haley, III, at 7 (January 21, 2009)("I could not tell the truth to him . . . .") . . . . One of the motives for lying to Odom would be to cover up the true intentions of senior management in an effort to avoid or postpone an EEOC charge.[13]

---

[13]Nothing in Haley's testimony indicates such a motive for the move.  Although Haley testified that he "could not reveal the truth [about the removal of the IT employees from his supervision] to him," he testified that the "truth" was the decision to remove the IT employees from his supervision was based on Williford's request, and Haley could not tell Odom the truth because Williford had asked that her request be kept confidential based on her fear that Odom would retaliate against her.  (Doc. 34-18 at 7-8.)  Regarding his testimony that he could understand Odom might consider the move retaliatory and he had to lie to Odom, Haley stated:

> Knowing what I know now about the scope of the poor relationship between SAC Adams and AO Odom, I can understand how AO Odom could perceive the [reassignment of the IT employees] as a retaliatory act against him.  However, at no time was I involved in nor did I observe any discussion with the SAC to retaliate against AO Odom, to keep limits on AO Odom's authority, or to downgrade his position.  . . .

> . . . AO Odom also asked me directly the reason for the [IT employees] move to ASAC Regan's supervision.  I could not reveal the truth to him as the division executive management had already made that decision, so I explained to him the SAC's rationale for wanting to keep the technical team together under one ASAC . . . .  One or two days after I had that conversation with AO

(Doc. 34 at 25-26 and n.8 [footnote added].)

The court finds that removal of a significant number of employees from plaintiff's supervision is the type of action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Therefore, for purposes of establishing a prima facie case of retaliation, the court finds that the removal of the IT employees from plaintiff's supervision was a materially adverse decision.

However, the court finds that plaintiff has not presented sufficient evidence to demonstrate that defendant's articulated reason for removing the IT employees from plaintiff's supervision was a pretext for retaliation.

If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991). "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his

---

Odom, he came to me once again and expressed concern that he was being "set up" for a downgrade to a lower GS level by removing technical personnel from his direct supervision. I told AO Odom that SAC Adams had never mentioned any intent to do that, and that the move of the IT staff to [ASAC's Regan's supervision] was to allow all technical personnel to be under single, unified command.

(*Id*. at 7-9.)

business judgment for that of the employer." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id*. "A plaintiff must show pretext with concrete evidence in the form of specific facts. Mere conclusory allegations and assertions will not suffice." *Dent v. Georgia Power Co.*, 522 Fed. Appx. 560, 563 (11th Cir. 2013)(quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir.2009))(internal quotations and citations omitted).

According to defendant, the IT employees were removed from plaintiff's supervision when Laura Williford, the IT Supervisor, requested to step down from her supervisor position in order to allow her an opportunity to recover from her medical condition, which was exacerbated under Odom's supervision. This is a reason that might well motivate a reasonable employer. The move was temporary and eventually the IT employees, as well as other technical employees, were returned to Odom's supervision. Plaintiff has not presented any "concrete evidence" that defendant removed the IT employees from his supervision for any reason other than Williford's request. Adams, Regan, and Haley may have avoided telling Odom about Williford's request, but no evidence offered by Odom indicates that Williford did not request the change and/or that defendant made the decision to change the IT employees' supervisor for some reason other than Williford's request.

Defendant's Motion for Summary Judgment will be granted and Count Four of plaintiff's Amended Complaint will be dismissed.

### b. Count Five – Text Messages

In his Amended Complaint, plaintiff alleges:

> The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of [the retaliatory animus of] Adams, Moore, Mathis, and others[,] known and unknown, . . . during the period, including but not limited to, January [to] April 2009 exchanged numerous text messages which detailed efforts to adversely affect Plaintiff, causing Plaintiff's [Performance Appraisal Reports] PARs to be lowered and making Plaintiff ineligible to be considered for merit pay increases, in retaliation for Title VII protected activities.

(Doc. 20-1 ¶ 159.)

Defendant has moved to dismiss Count Five on the ground that "private text messages between two non-supervisory employees are simply not a materially adverse action upon which a retaliation claim can be based." (Doc. 32 at 50.)  It contends that the text messages, (*see* doc. 33-1, exh. 11, at 117-23), "are at best ambiguous, do not specifically refer to Odom, are not being made by a supervisor, and cannot be shown to have harmed Odom.  In fact, Odom was not aware of those messages until the messages were provided to him by his attorney."  (*Id*.)  Plaintiff, in response to defendant's Motion for Summary Judgment, contends that "Senior management used EEO Counselor Moore as a personal informant about activities going on in the office."  (Doc. 34 at 26.)   He contends that these inappropriate emails were Moore's manner of gathering information, which he "attempted to use . . . in an effort to help the SAC."  (*Id*.)

33

The court finds that whether Moore, as EEO Counselor, acted as some sort of spy for "Senior Management," is irrelevant to whether his text messages constitute an adverse action taken against plaintiff. The text messages at issue do not indicate that they were sent to the SAC or an ASAC. Rather, the parties appear to agree that they were sent to Mathis.

In order to establish that the text messages constitute an actionable adverse action, plaintiff must establish that he was somehow injured or harmed by the text messages. *Burlington Northern*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). He must prove "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations omitted). Nothing in the record indicates that plaintiff was aware of these text messages before they were produced during discovery of another employee's civil action.[14] (*See* doc. 33-1 at 87.) "Logically, a reasonable worker cannot be dissuaded by a decision or action of which he is not aware." *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 676 (D.N.J. 2008). Therefore, for an action or decision to be materially adverse for purposes of supporting a retaliation claim, plaintiff must show that he was aware of the action or decision.

---

[14]The case, *Wallace v. Holder*, was filed on July 29, 2011. *Wallace v. Holder*, 2:11-CV-2723-VEH, doc. 1 at 1 (N.D. Ala. July 29, 2011).

34

Because plaintiff was not aware of the text messages between Moore and Mathis before filing his Complaint, the court finds that the text messages between Moore and Mathis are not materially adverse actions.  Defendant's Motion for Summary Judgment will be granted and Count Five of plaintiff's Amended Complaint, alleging retaliation based on these text messages will be dismissed.

### c. Count Six – Inquiry from Internal Inspection Division

Plaintiff alleges –

> The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Adams'[s], Moore['s], Mathis['s] and others['] . . . retaliatory animus on February 18, 2009[,] Plaintiff was served notice of an Administrative Inquiry from FBI Internal Inspection Division.  Plaintiff was interviewed extensively [and] subjected to severe ridicule and humiliation.

(Doc. 20-1 ¶ 161.)  Defendant argues that this claim is due to be dismissed because "the administrative inquiry does not rise to the level of a materially adverse action against Odom." (Doc. 32 at 51.)  Also, it argues that "there is no evidence that the investigation was initiated by Zarfoss based on a retaliatory motive."  (*Id*.)  Plaintiff contends, "Although Odom was eventually cleared, the initiation and completion of the so-called investigation caused him severe emotional distress, physical symptoms of stress, and many months of concern for his job.  The investigation itself was a violation of Title VII, and part of the retaliation for Odom's participation in protected activities."  (Doc. 34 at 27.)

During mediation of his claim based on the 2007 OSI, plaintiff told Associate Deputy Director Murphy that SAC Adams possibly "was using alcohol at work during duty hours."

(Doc. 34-2 ¶ 17.)  Odom repeated these statements in an email to Inspection Division.  (Doc.

33-1, exh. 9, at 109.)  He attributed the alcohol abuse statement to a remark made by Moore;

however, according to OPR's report, Moore denied making any such statement about SAC

Adams's alleged drinking problem and, in fact, he attributed the comment to plaintiff.  (*Id*.

at 109-10.)  Zarfoss testified that he initiated the investigation into plaintiff's allegation of

Adams's drinking problem when, during an investigation of the BFO and Adams, he "found

evidence that Plaintiff may have been abusing the IIS [Internal Investigations Section]

process," and he "determined that Plaintiff's conduct and statements may have been lacking

in candor."  (Doc. 33-27 ¶ 3.)   He stated:

> With respect to Plaintiff, I decided that the findings from my investigation of
> SAC Adams warranted a written referral to the Inspection Division discussing
> my findings related to Plaintiff and his potential misconduct.  No one from
> [BFO] management, including SAC Adams, instructed or suggested to me that
> the Inspection Division should investigate Mr. Odom for potential misconduct,
> nor did I initiate the inquiry which formed the basis of Count Six of Plaintiff's
> Amended Complaint to retaliate against the Plaintiff for engaging in protected
> EEO activity.

(*Id*. ¶ 5.)  Also, Zarfoss testified that the BFO "does not have any authority to direct the

Inspection Division to investigate a particular FBI employee."  (*Id*. ¶ 4.)

The court finds that a reasonable person may find an IIS investigation, especially if

unwarranted, to be sufficient to dissuade him or her from filing an EEO charge of

discrimination.  Therefore, the court will not dismiss this claim on the ground that the

investigation was not materially adverse.  However, plaintiff has submitted nothing to

indicate that defendant's articulated reason for initiating the investigation – Zarfoss's

determination that plaintiff's conduct and statements during the OPR investigation of Adams lacked candor – is a pretext and/or that the real reason was retaliation.  *See Chapman*, 229 F.3d at 1030; *see also Dent*, 522 Fed. Appx. at 563.

Therefore, defendant's Motion for Summary Judgment will be granted and Count Six of plaintiff's Amended Complaint, alleging retaliation based on the initiation of the IIS investigation will be dismissed.

### d.  Count Seven – Haley's Comment at September 2009 Supervisors' Retreat

In his Amended Complaint, plaintiff alleges:

> The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Haley's retaliatory animus on September 24, 2009[,] while at a supervisor retreat in Anniston Alabama, ASAC Robert Haley, Plaintiff's direct supervisor, in response to . . . "trust issues," stated that the trust issue in Birmingham FBI is a result of frivolous EEO and OPR complaints.  . . . [M]any of the people in the room had to provide signed statements and they were not happy.  Those in attendance were Plaintiff's peers and as a result Plaintiff was subjected to severe ridicule and humiliation.

(Doc. 20-1 ¶ 163.)  Defendant argues that this claim is due to be dismissed because the "one-time comment" was not a materially adverse action.  (Doc. 32 at 52.)  Plaintiff responds, "At the time [Haley made the comment], only Odom and [two] others had active EEO complaints.  Haley's comments singled out Odom and the [two] others for criticism, abuse, ridicule, and humiliation for filing EEOC complaints – a clear act of retaliation.  Haley's comments cannot be interpreted in any other manner than as retaliation for participation in the EEOC process." (Doc. 34 at 27.)  However, plaintiff testified that Haley did not identify

the EEO complainants, and he conceded that one pending complaint had been filed by plaintiff and one had been filed against him.  (Doc. 33-1 at 98-99.)  Moreover, plaintiff did not offer any concrete evidence of how he was ridiculed or humiliated by Haley's comments except to state that "it was very upsetting that he would say that in front of all of the supervisors and some non-supervisors."  (Doc. 33-1 at 100-01.)

The court finds that Haley's comments at the supervisors' retreat were not, in and of themselves, a materially adverse action.  As set forth above, the statement, in context, was not a threat; it appears to be a plea for cooperation and communication before resort to EEO charges and OPR complaints.[15]  As Haley never mentioned plaintiff by name, his statement alone was not such that a reasonable employee would be dissuaded from filing an EEO complaint after hearing the statement.   Moreover, as set forth above, plaintiff must prove injury or harm.  *Burlington Northern*, 548 U.S. at 67.  Without some concrete example of harm or injury arising from the comment, the court finds plaintiff has not established that the statement was a materially adverse action.

---

[15]Haley testified that he "said words to the effect of, . . . part of the problem that we have and the breakdown of trust is that people are relying on civil processes, be they EEO or OPR, we are flinging things out of our division without giving each other the benefit of sitting down face to face or man to woman to at least give each other the professional courtesy of trying to work through our differences and come to some common ground." (Doc. 33-3 at 294.)  Plaintiff's testimony is not inconsistent with Haley's statement; plaintiff testified that Haley said, "[T]he morale issue on the support side of the house in the Birmingham division are because of frivolous EEO and OPR complaints.  Some of the people in this room have had to raise their right hands and give signed sworn statements, and they are not happy, and that has caused a chill among those who have had to give those statements."  (Doc. 33-1 at 97-98.)

Defendant's Motion for Summary Judgment will be granted and Count Seven of plaintiff's Amended Complaint will be dismissed.

### e.  Counts Eight, Twelve, and Thirteen – The "Excellent" Performance Appraisal Reports (PARs)

In his Amended Complaint, plaintiff contends:

165.  The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Haley's retaliatory animus, Plaintiff's PAR for the period ended [September 30, 2009], was lowered as a direct and proximate result of Title VII protected activities making Plaintiff ineligible and incapable of being chosen for a merit pay increase.

. . .

173.  The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Maley's retaliatory animus, Plaintiff's Performance Appraisal Report, (PAR), for the period ended [September 30, 2010], was lowered as a direct and proximate result of Title VII protected activities making Plaintiff ineligible for and incapable of being chosen for a merit pay increase.

. . .

175.  The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Maley's retaliatory animus, Plaintiff's Performance Appraisal Report, (PAR), for the period ended [September 30, 2011], was lowered as a direct and proximate result of Title VII protected activities making Plaintiff ineligible for and incapable of being chosen for a merit pay increase.

(Doc. 20-1 ¶¶ 165, 173, 175.)  Defendant contends that these claims are due to be dismissed because plaintiff cannot show that an "Excellent" rating is materially adverse and, even if his "Excellent" PARS were materially adverse, he cannot demonstrate that defendant's

articulated reasons for giving him "Excellent," as opposed to "Outstanding," appraisal reports are unworthy of credence and/or the real reason was retaliation.  (*See* doc. 32 at 46-48, 53-54.)  Plaintiff responded by stating:

> Count Eight – the 2009 PAR:  On September 30, 2009, ASAC Haley gave [plaintiff] a lower PAR overall rating than [he] deserved.  When the rating score reached the midpoint of the point scale between an "Excellent" rating and an "Outstanding" rating . . . , Haley chose to round the score down instead of rounding it up.

> Additionally, an earlier draft of the narrative from this report demonstrates that Haley deleted the following comment from the final PAR: "Through the reporting period, AO Odom tended to 'delegate decisions upward,' and often sought guidance and/or direction from superiors before making a final decision for activities for which he was directly responsible."  Yet, the deletion of this comment did not appear to positively affect the numerical scores as it should have.

> As a result, Odom received the lower "Excellent" rating when he should have received an "Outstanding" rating.  Haley's rating paradigm was consistent with his dim view of those who participated in the EEO process and were in retaliation for Odom's participation in the EEO process.

> . . .

> Count Twelve – the 2010 PAR:  SAC Maley implemented a policy on September 17, 2009, whereby QSI awards would only be made to those employees with an overall "Outstanding" on their PARs, and who had "earned the respect" of their peers and subordinates.  Once again, Maley's personal policy did not follow FBI policies and procedures, which did not place any requirement related to "respect" on QSI awards.  SAC Maley then rated [plaintiff] as "Excellent" rather than "Outstanding" for the PAR dated September 30, 2010, and downgraded him subjectively for lack of "respect" from Odom's subordinates.  As a result, Odom was not eligible for a QSI award in FY 2011, and lost the financial benefit of the automatic step increase within his pay grade that came with it.  These actions were in retaliation for Odom's prior participation in the EEO process.

> Count Thirteen – the 2011 PAR:  Similarly, SAC Maley also rated [plaintiff] as "Excellent" rather than "Outstanding" for the PAR dated September 30, 2011.  As a result, [plaintiff] was not eligible for a QSI award in FY 2012, and lost the financial benefit of the automatic step increase within his pay grade that came with it.  These actions were in retaliation for Odom's prior participation in the EEO process.

(Doc. 34 at 28, 30-31.)

With regard to the determination of whether the challenged decisions were "materially adverse" for purposes of supporting a retaliation claim –

> The Supreme Court observed four things . . . .  First, it emphasized the need "to separate significant from trivial harms" and warned that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." [*Burlington Northern*, 548 U.S. 53, 68] (citations omitted). Second, it is an objective standard.  *Id*. at 68-69.  Third, "[c]ontext matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 69 (internal quotation marks and citations omitted).  Fourth, "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint."  *Id*.

*Mendoza v. Helicopter*, No. 12-11053, 2013 WL 6225181, *3 (5th Cir. Dec. 2, 2013)(unpublished).  The court finds that, based on the facts of this case, an "Excellent" PAR, as opposed to an "Outstanding" PAR is a trivial difference that would not dissuade a reasonable employee in Odom's position from engaging in protected activity.

First, plaintiff contends that the only harm in receiving an "Excellent" PAR is that he was not eligible for a QSI.  (Doc. 33-1 at 71-72.)  However, plaintiff has no expectation or entitlement to a QSI, even if he had received an "Outstanding" PAR. An "Outstanding" PAR is one requirement for consideration for a QSI, but an "Outstanding" PAR does not ensure

such an award.  Plaintiff received an "Outstanding" PAR in 2007, but he was not selected by the panel to receive one of the limited number of QSIs available.  Second, plaintiff has not shown that he was entitled to or expected an "Outstanding" PAR.  His employment history does not indicate that he routinely achieved an "Outstanding" rating or that such rating was the norm or commonplace.  Third, plaintiff's receipt of normal, ordinary step increases and even a cash award were not adversely effected by an "Excellent" PAR.  Plaintiff was not subject to any adverse employment action – such as probation or termination – based on an "Excellent" PAR.  *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006)(In Title VII sexual harassment claim the Eleventh Circuit held:  "A lower score on [his] performance evaluation, by itself, is not actionable under Title VII unless [plaintiff] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities."  (citing *Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001))), *quoted in Cain v. Geren*, 261 Fed. Appx. 215, 217 (11th Cir. 2008)(retaliation case).

Under the circumstances, the court finds that the "Excellent" PARs in 2009, 2010, and 2011 were not materially adverse actions that would dissuade a reasonable employee from filing an EEO complaint.  Therefore, defendant's Motion for Summary Judgment is due to be granted and Counts 8, 12, and 13, will be dismissed.

However, even if the court assumes the "Excellent" PARs were materially adverse actions, plaintiff has not shown that defendant's reasons for rating his job performance as

"Excellent" were a pretext for retaliation.  In a case in which a plaintiff had received a

below-average performance review, this court stated:

> Even assuming, for the sake of argument, that [plaintiff] had established a *prima facie* case of retaliation, his claim would nevertheless fail.  In accordance with the *McDonnell Douglas* burden shifting analysis, [defendant] has articulated legitimate, non-discriminatory reasons for the challenged employment actions.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  This intermediate burden is "exceedingly light."  *See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994).  [Defendant] was under no obligation to treat [plaintiff] ***more*** favorably simply because he lodged a complaint of discrimination against a co-worker.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  [Plaintiff] has completely failed to establish that [defendant's] articulated legitimate, non-discriminatory reasons for the challenged employment decisions were pretextual.  To establish pretext, a plaintiff must "present concrete evidence in the form of specific facts" showing that the defendant's proffered reason was pretextual.  *See Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009); *see also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005)(A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherences or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.").  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).  Conclusory allegations and assertions are insufficient.  *See Bryant*, 575 F.3d at 1308.  Although there is some self-serving dispute in the record as to whether or not the below-average performance review and the verbal warning were "false," [plaintiff] presents absolutely ***no*** evidence that retaliation was the real reason for that and the other challenged actions, other than making a blanket assertion that the actions were done "as retaliation for his reporting of [his co-employee]."  This is clearly insufficient to establish pretext.

*Satterfield v. Board of Trustees University of Alabama*, No. 2:11-CV-3057-JHH, 2012 WL

3139693, *6 (N.D. Ala. July 30, 2012)(Hancock, J.)(emphasis in original; internal citations

to the court's record omitted).

Plaintiff testified that his PARs were lowered because of his reduced responsibilities as AO. (Doc. 33-1 at 80-82, 117, 125-27.) However, his speculation is not supported by concrete evidence in the record. Haley testified that Odom had a tendency to manage by email, which was an issue he had discussed with Odom on a number of occasions. (Doc. 33-2 at 128-29.) Maley testified that he never considered plaintiff's performance to be Outstanding and the PARs reflected this fact. (Doc. 33-4 ¶¶ 7-8.) Plaintiff has not shown that he "received the lower 'Excellent' rating when he should have received an 'Outstanding' rating." (Doc. 34 at 28.) He has not proved that Haley and/or Maley did not honestly believe his performance was excellent during the rating periods or that they reduced his PAR based on his prior protected activity.

Therefore, defendant's Motion for Summary Judgment will be granted and Counts Eight, Eleven, and Twelve will be dismissed.

### f.  Count Nine – Maley's Oversight

In his Amended Complaint, plaintiff alleges, "The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Maley's retaliatory animus on October 16, 2009, SAC Patrick Maley changes direct supervision of Plaintiff from ASAC Haley to SAC Maley causing increased oversight." (Doc. 20-1 ¶ 167.) Defendant contends that the change in plaintiff's direct supervision was not materially adverse and plaintiff has not demonstrated that defendant's articulated reason for the change was a pretext

for unlawful retaliation.  Plaintiff does not specifically respond to defendant's arguments; instead, he argues:

> The vast majority of the AOs in the FBI are not rated by their SACs.  During the rating period which ended on September 30, 2010, Maley informed Odom that Maley would not give the Plaintiff an "Outstanding" PAR because Maley believed that people under Odom's supervision could not trust him.  Maley declined to elaborate on this belief, and failed to provide Odom either any specifics or any constructive criticism which Odom could use for self-improvement.

(Doc. 34 at 28-29.)

"To be sure, reassignment of job duties is not automatically actionable." *Burlington Northern*, 548 U.S. at 71.  Also,"Increased scrutiny of an employee's job performance in the wake of protected activity may be evidence of a retaliatory motive, in connection with a claim that the employee thereafter terminated or disciplined an employee, ostensibly for work misconduct." *Flowers v. City of Tuscaloosa*, No. 7:11-CV-1375-JEO, 2013 WL 625324, *24 (N.D. Ala. Feb. 14, 2013)(citing *Hamilton v. General Elec. Co.*, 556 F.3d 428, 436-37 (6th Cir. 2009)).  "Such monitoring, however, has generally been deemed not actionable in itself." *Id*. (citing *O'Brien v. Department of Agriculture*, 532 F.3d 805, 809-10 (8th Cir. 2008); *Davis v. United States Postmaster Gen.*, 190 Fed. Appx. 874, 875-76 (11th Cir. 2006); *Harbuck v. Teets*, 152 Fed. Appx. 846, 847-48 (11th Cir. 2005)).  The court finds that no reasonable employee would be dissuaded from filing an EEO complaint based on the change in supervisors.

Moreover, even if such a change in supervision and any corresponding increased scrutiny could be considered materially adverse, plaintiff has not demonstrated that Maley's articulated reason for the change – his decision to bring a "new perspective on how the Support employees were being managed" by directly supervising plaintiff was based on his determination, after "systematic" questioning of Support Services employees and meeting with his management team, that the low morale in the Support Division was attributable to employees' "lack of trust" in plaintiff, (doc. 33-4 ¶ 4) – is a pretext for retaliation.  Plaintiff's contentions that Maley should have provided him with constructive criticism a year after he began supervising plaintiff and that most other AOs are supervised by ASACs does not address head-on and rebut Maley's reason for assuming supervision of plaintiff or indicate that Maley's management style was attributable to a retaliatory animus.

Therefore, defendant's Motion for Summary Judgment will be granted and Count Nine of plaintiff's Amended Complaint will be dismissed.

### g.  Count Ten – Budget Meetings and Discretionary Funds

Plaintiff alleges –

> The Defendant violated the anti-retaliation provision of Title VII when, as a direct and proximate result of Maley's retaliatory animus from 2009 – present, Plaintiff was excluded from routine weekly budget meetings and access to discretionary funds causing a significant reduction in ability to perform limited warrant holder/procurement duties as outlined in position description.  Coordination of budget duties was shifted to ASAC Haley.

(Doc. 20-1 ¶ 169.)

Defendant contends that the budget meetings between Haley and the financial manager are "not real substantive." (Doc. 32 at 56.) Moreover, pursuant to a change in FBI policy, Odom was removed as the financial manager's supervisor, and, therefore, he had no reason to attend the weekly meeting between the financial manager and her supervisor, Haley. Defendant argues that plaintiff cannot show that his exclusion from the meetings was materially adverse and/or the reason for the change was a pretext for retaliation. Plaintiff argues that his exclusion from the meetings, which he contends were "budgetary and planning activities," meant he had no input into "most of the financial matters." However, he makes no effort to dispute Haley's sworn testimony that the weekly meetings were not substantive. No reasonable employee would be dissuaded from filing an EEO Complaint by virtue of being excluded from weekly, non-substantive meetings between a supervisor and his subordinate, when both actors were outside the reasonable employee's chain of command. Moreover, plaintiff has presented no evidence that challenges Haley's articulated reason for not including plaintiff in these meetings with the financial manager – plaintiff was not in the chain of command between Haley and the financial manager – is a pretext for retaliation.

Also in Count Ten, plaintiff complains that defendant limited his authority as a warrant holder. Specifically, he testified that before he engaged in any protected activity he could approve purchases of up to $25,000 without approval from an ASAC. However, sometime later his authority was limited to $250. According to defendant, Maley made the decision to limit plaintiff's authority to spend discretionary funds because he wanted "one

person to see all the request so we could make the best cost/benefit decisions in how we spend finite resources," (doc. 33-4 ¶ 5); in other words, Maley wanted virtually every purchase reviewed by the ADAC, (*see* doc. 33-2 at 223).  Plaintiff makes no effort to establish that Maley's reason for limiting plaintiff's authority was a pretext for retaliation.  Certainly wanting to have one individual – in the case Haley – to have knowledge of all significant purchases using discretionary funds is a reason that would motivate a reasonable employer to limit unreviewed purchasing authority.  Because plaintiff has not addressed Maley's reason for limiting his purchasing authority, defendant's Motion for Summary Judgment will be granted and this claim will be dismissed.

### h.  Count Eleven – Email Regarding Supervision of Support Service Employees

In Count Eleven of plaintiff's Amended Complaint, plaintiff alleges:

> The Defendant violated the anti-retaliation provision of Title VII when as a direct and proximate result of Maley's . . . retaliatory animus on February 6, 2010, SAC Maley notifie[d] all Birmingham FBI employees, via email, that . . . he "has assumed direct supervision of the Support Services Section (SSS) in Headquarters City (HQC), effectively removing primary duties of Plaintiff.

(Doc. 20-1 ¶ 171.)  Defendant contends that plaintiff has no claim based on this email because, despite plaintiff's construction of Maley's words, Maley never actually assumed direct supervision of the Support Services employees and "Odom has always remained the direct supervisor over that Section."  (Doc. 32 at 58.)  Plaintiff, however, asserts that Maley actually "removed duties" regarding responsibility for the Support Services employees.  (Doc. 34 at 30.)

48

Plaintiff testified, "[T]he responsibilities and duties assigned to me in the AO position description gave me far more flexibility than Mr. Maley ever allowed me to have, and he tied that directly to this trust issue." (Doc. 33-1 at 127.) He did not testify that Maley actually assumed direct supervision of the Support Services employees, and his immediate response to the email does not indicate otherwise. (*Id*. at 105-06, 127-28; doc. 33-3, exh. 13, at 51.) The email itself does not appear to have had any real effect on plaintiff. Therefore, the court finds that plaintiff has not established that the email was a materially adverse action.

Defendant's Motion for Summary Judgment will be granted and Count Eleven will be dismissed.

### 2.  Hostile Work Environment

Plaintiff alleges –

Plaintiff was subjected to a retaliatory hostile work environment, including but not limited to, reductions in PAR, loss of merit pay increases, removal from routine budget meetings, significant removal of duties, increased surveillance, increased oversight, removal of employees, administrative inquiries, employees conspiring to fabricate negative information through text messaging and other means, ridicule, humiliation, emotional stress, physical stress, and severe mental anguish as a result of actions described in the paragraphs above. From March 28, 2007 through the present, the retaliatory hostile actions have been severe and pervasive. The retaliatory hostile actions were intended to dissuade anyone, including the Plaintiff, from seeking protection under Title VII.

(Doc. 20-1 ¶ 177.)

Defendant contends that it is entitled to judgment as a matter of law as to plaintiff's hostile-environment claim because –

49

> a reasonable person would not find that "Excellent" performance appraisals, the temporary transfer of the IT staff, the permanent transfer of Moore, and the other minor complaints making up Odom's thirteen causes of action are materially adverse under the above facts.  Not only were the events described in Odom's complaint spread out over approximately four years, they were not severe and the allegations related to many of the individual Counts are frivolous.

(Doc. 32 at 59.)  Plaintiff responded by listing his alleged discrete acts of retaliation and arguing that these acts can be considered part of his hostile environment claim.  (Doc. 34 at 32-34.)

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State University*, 133 S. Ct. 2434, 2441 (2013)(citations omitted).  "To establish a hostile work environment claim under Title VII, the plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012)(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); other citations omitted).  However, allegations of discrete acts that must be challenged as separate statutory discrimination and retaliation claims . . . cannot be brought under a hostile work environment claim that centers on 'discriminatory intimidation, ridicule, and insult.'"  *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008)(citing *Morgan*, 536 U.S. at 111-13, 116; other citations omitted); *Chambless*, 481 F.3d at 1349-50 (discrete acts may be considered as part of a hostile work environment claim if they are "sufficiently related" to the alleged harassment). *Cf. Gowski*,

682 F.3d at 1312-13 ("Discrete acts cannot alone form the basis of a hostile work environment claim.  But the jury could consider discrete acts as part of a hostile work environment claim.")(internal citations omitted).

The court finds that no reasonable person in plaintiff's position would find that defendant's conduct, as exemplified by the list of discrete decisions and actions, permeated plaintiff's work environment with retaliatory intimidation, ridicule, and/or insult sufficient to alter his working conditions.  Nothing in the record indicates that defendant's discrete decisions were accompanied by intimidation or ridicule of which Odom was aware. Although plaintiff testified that he was humiliated by the series of discrete decisions, a reasonable jury could not find that these decisions were so severe and/or pervasive as to create a hostile or abusive work environment based on retaliatory harassment.

Defendant's Motion for Summary Judgment will be granted and Count Fourteen of plaintiff's amended Complaint will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 31), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 25th day of March, 2014.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE